EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
SHARON R. WOODEN
Deputy Attorney General
State Bar No. 108709
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-3664
 Telephone: (415) 703-5966
 Fax: (415) 703-1234
 Email: sharon.wooden@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **ELIEZER SALCEDO,**<br><br>                    Petitioner,<br><br>     v.<br><br>**F. B. HAWS,**<br><br>                    Respondent. | CV 07-5513 MHP |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR HABEAS CORPUS**

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
SHARON R. WOODEN
Deputy Attorney General
State Bar No. 108709
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-3664
  Telephone: (415) 703-5966
  Fax: (415) 703-1234
  Email: sharon.wooden@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **ELIEZER SALCEDO,**<br><br>                    Petitioner,<br><br>  v.<br><br>**F. B. HAWS,**<br><br>                    Respondent. | CV 07-5513 MHP<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO PETITION FOR HABEAS CORPUS** |

## STATEMENT OF THE CASE

Petitioner was sentenced to serve a determinate term of 28 years followed by an indeterminate term of 40 years to life in state prison after he was convicted of second degree murder, four counts of attempted murder, discharging a firearm at an inhabited dwelling, and possession of a firearm by a felon, and allegations that he intentionally and personally discharged a firearm during the offense and caused great bodily injury were found true. 2 CT 537-538, 540-554, 568; 3 CT 691-696.

Petitioner appealed to the California Court of Appeal. On September 29, 2006, the Court of Appeal affirmed the judgment. Exh. 3. On November 8, 2006, petitioner filed a Petition for

Review in the California Supreme Court, which was denied on December 13, 2006. Exhs. 4, 5. Petitioner filed the instant Petition for Writ of Habeas Corpus in the United States District Court on October 30, 2007.

## STATEMENT OF FACTS

The facts of the case were summarized by the California Court of Appeal as follows:

**The York Street Shooting**

Robert Martinez (Robert) and his sister Leticia Ramirez (Leticia) lived in a pair of flats at 1161/1163 York Street. At approximately 3:00 a.m., Saturday, April 28, 2001, they and their friends Barbie Ledesma (Barbie), Veronica Martinez (Veronica), and Pablo Ojeda (Pablo) were sitting and/or standing on the stoop or front sidewalk of the York Street residence, talking, drinking and listening to music. A burgundy Honda with lightly tinted windows pulled into a driveway two houses to the right of 1161/1163 York Street, then backed out of the driveway into the street, where it stopped with its engine running. Because he thought it belonged to a friend who had similar-looking car, Robert, carrying a red cup with a drink in one hand, walked toward the Honda, nodded his head in greeting, and may have said, "What's up?" Appellant got out of the passenger door. He was carrying a black pistol. Robert saw a flash, heard a fireworks-like sound, and ran toward his companions, yelling at them to get down. He heard more gunshots as his companions scattered. He covered his sister on the ground, and when he looked back toward the burgundy Honda, he saw appellant and the Honda's driver standing on either side of the rear of the Honda with their hands in a forward position. They were at the midpoint of the street, approximately 15 feet from the curb. The shooting stopped when the burgundy Honda departed.

Patrol Officer Michael Browne heard a radio call on the shooting at 3:10 a.m. Eight to ten minutes later he saw a burgundy Honda at the intersection of Bayshore Boulevard and Industrial Avenue, which he estimated to be a four to eight minute drive from 1161/1163 York Street. The Honda sped away after he signaled it to stop. Browne gave chase, and the Honda eventually stopped near the edge of San Francisco Bay. Two men got out of the Honda and ran away. Appellant was apprehended hiding behind a parked car. The other man, Mauricio Sandoval, was apprehended in the water of the bay, holding onto a pier piling. Robert was brought to the site and unhesitatingly identified appellant as a shooter.

The police recovered a .25 caliber automatic weapon from the passenger floorboard of the Honda, a live .25 caliber round from the driver's seat, and a purse containing a mobile telephone subscribed to Mona Lisa Frias from under the front passenger seat. The Honda had no bullet damage, although it contained gunshot residue on its passenger door. The DNA profiles of appellant and Sandoval were found on the gun grip of the .25 caliber weapon. The Honda was registered to Veronica Martinez.

Police inspectors recovered 12 bullet casings at the York Street shooting scene, five from a .25 caliber automatic weapon and seven from a nine millimeter weapon. A white car parked in front of 1161/1163 York Street had six bullet holes; the garage door of 1161/1163 York Street and the house next door also had bullet holes. The inspectors opined that the white car was struck by bullets from the nine millimeter gun and that the shooter stood in the street near the driver's side of the white car. They also opined that the shooters were in the midpoint of the street, approximately 15 feet from the curb, during the shooting.

Leticia died from a single bullet wound to the forehead. The bullet recovered from her body was deformed, indicating it had ricocheted off a hard object, like a car or concrete, before hitting her. It was likely a nine millimeter bullet. Robert and his other companions were not injured.

**The Oakdale Avenue Events**

At approximately 11:30 p.m., Friday, April 27, 2001, Veronica Martinez drove her burgundy Honda to the Oakdale Avenue house of her boyfriend, Richard Rojas. She was accompanied by her cousins Cindy Quijeda and Susannah Frias. Frias did not take her purse and mobile telephone into the house; she left them under the Honda's front passenger seat. Although Frias had the use of the telephone, it belonged to her mother Mona Lisa.

Mauricio Sandoval was at the house when Martinez and her cousins arrived. Appellant and two other men, known as T and Pee Wee, subsequently arrived.

At approximately 2:45 a.m., at T's request, Martinez gave her car keys to appellant so he could go to a liquor store. She did not see appellant or Sandoval leave the house. Some time later, Martinez, who had been in the bedroom, came into the living room to ask if her car had been returned; it had not. T was not in the house. He returned approximately 15 minutes later and, seemingly in a hurry, told Rojas and Pee Wee " Let's go." The three men left the house, and when they returned 20 minutes later they were very quiet and downcast. After Martinez twice asked them about her car's whereabouts, T yelled, "You're going to get your car back. We're not going to get our boys back." Pee Wee told Frias that he had "lost [his] homies."

Martinez arrived home at 4:00 a.m., Saturday, April 28. She told her mother the Honda was stolen from a club, and at 5:00 a.m. she filed a car theft report at the police station. Later that day she learned from a friend that her car was involved in a homicide.

On April 29, Martinez was asked to come to the police station. She reiterated that her car had been stolen and, after being shown pictures of appellant and Sandoval, denied knowing them. Frias was also contacted by the police and told them the Honda was stolen.

Three weeks later, accompanied by their lawyers, Martinez and Frias met with a deputy district attorney and gave statements as to what had actually happened in the early morning of April 28. Frias originally lied about Martinez's car because she feared T, Pee Wee or Rojas would injure her if she "snitched" on them.

Records of the mobile telephone registered to Mona Lisa Frias showed two calls from it to T's mobile telephone on April 28: a one minute call at 3:10 a.m. and a 14 minute call at 3:17 a.m.

Exhibit 3 at 2-4.

**STANDARD OF REVIEW**

This case is governed by 28 U.S.C. § 2254 as revised by the AEDPA, which provides that the federal court cannot grant habeas relief unless the state court's ruling "was contrary to, or

involved an unreasonable application of," clearly established United States Supreme Court law, 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2). *Williams v. Taylor*, 529 U.S. 362, 411-413 (2000).

## ARGUMENT

### I.

**SUFFICIENT EVIDENCE SUPPORTS PETITIONER'S ATTEMPTED MURDER CONVICTIONS**

Petitioner contends there was insufficient evidence to sustain his convictions for attempted murder in counts 3, 4, and 5, because there was no proof that he created a "kill zone" or had an intent to kill. Petition, 5, 1-18.

"As a matter of federal constitutional law, 'the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005), citing *In re Winship*, 397 U.S. 358, 364 (1970). "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d at 1274. The relevant question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 326 (1979).

After the AEDPA, federal courts apply the standards of *Jackson* with an additional layer of deference. The question this Court must ask is whether the decision of the California Court of Appeal reflected an unreasonable application of *Jackson* and *Winship* to the facts of this case. *Juan H. v. Allen*, 408 F.3d at 1275.

Petitioner was convicted of the attempted murders of Robert Martinez (count II), Pablo Ojeda (count III), Veronica Martinez (count IV), and Barbie Sanchez (count V). 1CT 99-102; 2CT 540-546. Petitioner acknowledges that he was properly convicted for his attempt to kill Robert Martinez, because Martinez was his intended target. However, petitioner asserts there was insufficient evidence to establish that he intended to kill Pablo Ojeda, Veronica Martinez, or Barbie

Sanchez, because his intent to kill Robert Martinez could not be transferred to everyone standing in front of the Martinez house at the time of the shooting. According to petitioner, the evidence on counts III, IV and V only supported convictions for assault with a deadly weapon. Petition, 5-10.

However, this was not a case where the defendant fired a single shot in the direction of where his intended target could be seen. Instead, petitioner sprayed an unarmed group of people with bullets from a semiautomatic weapon from a distance of 15 feet away. Petitioner clearly created a "kill zone" when he fired his semiautomatic weapon with the intent to kill Robert Martinez and the concurrent intent to kill everyone in Robert's immediate vicinity to ensure Robert's death. Under California law, even if a defendant primarily wanted to kill the victim rather than others in the victim's vicinity, a jury could reasonably find a concurrent intent to kill those in the vicinity when the defendant fires a flurry of bullets and thereby creates a "kill zone." Such a finding fully supports an attempted murder conviction. *People v. Bland*, 28 Cal.4th 313, 326 (2002).

Petitioner's claim that the evidence below was insufficient to prove an intent to kill anyone in the "kill zone" (Petition, 10-18) raises a question of state law, which the California Court of Appeal addressed on direct review in the following portion of its opinion:

> Appellant argues that the evidence was sufficient to support a finding that Robert was the only intended victim. As he argues, the shooting was a reaction to Robert's approaching the Honda, which was in the middle of the street, and greeting the Honda's occupants by word and/or gesture while carrying an object in his hand. On the other hand, he continues, the shots occurred in single, rapid sequence as Robert ran from the street to his house; appellant and his co-defendant remained in the middle of he street; they did not approach Robert's house or the people gathered in front of his house, nor did he and his co-defendant move so as to avoid the obstacles (parked white car, tree) that prevented their having a clear shot at the people in front of Robert's house; their shots hit the white car parked in front of Robert's house, his garage, and the corner of the neighbor's house, not the stairs or front of Robert's house; and there was no evidence that appellant knew any of the people gathered at Robert's house. Appellant argues that, while there facts would readily support a conviction for assault with a deadly weapon on Pablo, Barbie, and Veronica, they cannot support an attempted murder of them because these facts are insubstantial to support a specific intent to kill them.
>
> We disagree. Appellant correctly observes that the requisite element of specific intent to prove attempted murder cannot be premised on the doctrine of transferred intent, which, in its classic form, applies when a defendant shoots with the intent to kill one person but instead hits and kills another person. Under that factual scenario, the shooter is subject to the same criminal liability that would have been imposed had the fatal shot reached the intended victim. (*People v. Bland* (2002) 28 Cal.4th 313, 317, 321, 326.) To be guilty of an attempted murder charge, however, "the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and

> attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id*. at p. 328.) Thus, the finding that appellant specifically intended to kill Robert does not, standing alone, suffice to find that he also intended to kill Pablo, Barbie, and Veronica.
>
> However, the fact that a defendant wanted to kill a particular target does not preclude finding that he also, concurrently, intended to kill others within what is termed the "kill zone." (*Bland*, *supra*, 28 Cal.4th at p. 329.) "The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . [C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. . . ." (*Id*. at pp. 329-330.)
>
> In this case, the jury, which was instructed on the "zone of harm" theory of specific intent in attempted murder, could reasonably conclude that even if appellant's primary target may have been Robert, he also intended to kill Pablo, Barbie, and Veronica by creating a "kill zone." Appellant did not simply stay in his car and fire one shot directly at Robert. Rather, he got out of the car and, from a relatively short distance of 15 feet, fired numerous shots from a semi-automatic weapon in the direction of a small group of unarmed men and women who were socializing in the close proximity in a locale from which there was no ready escape, and he continued shooting after the group hit the ground. Furthermore, he was accompanied by another shooter who also fired multiple shots from the same vantage point. The fact that appellant did not come any nearer to the house of the group of people as he was shooting, and that his shots hit the garage, the house next door, and a parked car does not militate against an intent to kill by creating a zone of harm. Rather, the jury could instead conclude that, fortuitously, appellant was not a good marksman and that he wanted to stay close to the car for a fast getaway.
>
> The jury was presented with substantial evidence from which to find appellant had the intent to kill Pablo, Barbie, and Veronica and thus to reach a verdict of attempted murder of these three people.

Exhibit 3 at 5-8.

Pablo Ojeda, Veronica Martinez, and Barbie Sanchez Ledesma were clearly in a zone of harm during the shooting. Petitioner fired an automatic weapon at a group of unarmed people from a distance of 15 feet away, and the jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of automatic weapons, that petitioner harbored a specific intent to kill every living being within the vicinity of his intended target. The California Court of

Appeal's conclusion that petitioner intended to kill everyone in the kill zone was not an objectively unreasonable application of federal law or an unreasonable determination of the facts.

## II.

### THE JURY WAS PROPERLY INSTRUCTED

Petitioner contends the jury was erroneously instructed in violation of his rights to due process and a fair jury trial. Petition, 5, 19-28.

A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Also, it is well established that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Id*. To determine whether a due process violation occurred, the federal habeas court asks whether there was a reasonable likelihood that the jury applied the instruction in a way that violated the Constitution. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). "[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.*; *see Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (reversing grant of the writ and finding no constitutional error where one instruction was admittedly an incorrect statement of state law but other instructions were correct).

The trial court instructed the jury that attempted murder requires a specific intent to kill. 2CT 434. The court also instructed the jury with the original version of CALJIC No. 8.66.1, as follows:

> A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to ensure harm to the primary victim, by harming everyone in that victim's vicinity.
>
> Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a zone of risk is an issue to be decided by you. (2CT 435.)

Before its 2004 revision, the language of CAJLJIC No. 8.66.1 was taken directly from *Brand*: "The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude that the perpetrator intended to ensure harm to the

primary victim, by harming everyone in that victim's vicinity." *People v. Bland*, 28 Cal.4th at 329.

The 2004 revision to CALJIC No. 8.66.1 substituted "intended to kill" and "killing" for the words "harm" and "harming" in the original instruction. Although the revised version is an improvement, the words "harm" and "harming" in the original instruction did not permit the jury to convict petitioner of attempted murder by finding intent to harm rather than intent to kill.

Specifically, given the instructions as a whole and all other relevant circumstances, there is no reasonable likelihood that the jury misapplied the law. *Estelle v. McGuire*, 502 U.S. at 72. The challenged instruction did not permit the jury to convict on a finding of a lesser intent than intent to kill. Nor did the instruction mislead the jury into believing that an intent to kill could support an attempted murder instruction. Although the instruction spoke of harming rather than killing, the instruction specifically told the jurors that it was up to them to decide whether the perpetrator actually intended to kill the victim, either as a primary target or as someone within a zone of risk.

Petitioner argues the substitution of the words "harm and harming" for the words "kill and killing" fundamentally changed the definition of the required concurrent intent in that it failed to tell the jury that concurrent intent to kill required a finding of specific intent to kill each individual in the zone of risk. Petitioner also argues the instructional error dramatically reduced the prosecution's burden of proof at trial. According to petitioner, the error mandated reversal per se. Petition, 20-25. The California Court of Appeal rejected petitioner's contention that instructional error violated his federal constitutional rights:

> Appellant contends the court erred in instructing that the jury could infer a specific intent to kill Robert, Pablo, Barbie and Veronica from an intent to harm.
>
> CALJIC No. 8.66.1, as given to this jury, states: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. The intent is concurrent when the nature and scope of the attack, while directed at a primary victim are such that it is reasonable to infer the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. [ ] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a zone of risk is an issue to be decided by you." (Italics added.) The language of this instruction is taken directly from Bland: "The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." (*Bland, supra,* 28 Cal.4th at p. 329.)
>
> Appellant argues this instruction misstates the law because the "kill zone" theory of liability permits an inference of intent to kill all persons in the zone when the defendant

targets one person therein, and the substitution of "harm" for "kill" fundamentally changes the definition of inferred concurrent intent. He further argues that permitting a finding of intent to kill based on intent to harm reduced the People's burden of proof on the attempted murder charges and denied him his constitutional rights of due process and a fair trial.

Whether a jury instruction is correct is determined from the court's entire charge, not from a consideration of parts of an instruction or a particular instruction. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Even if the instruction was incorrect, the question for the reviewing court is whether, by itself, the instruction infected the entire trial to such an extent that the resulting conviction violated some constitutional right. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72.) Additionally, when the instruction is ambiguous, the reviewing court asks whether there is a reasonable likelihood the jury applied the instruction in a manner that violated the Constitution. (*Ibid.*)

As given in this case, CALJIC No. 8.66.1 was arguably ambiguous. On the one hand it refers to the defendant's "concurrent inten[t] to kill" persons within a particular zone of risk. On the other hand it refers to this intent being concurrent if there is a reasonable inference the defendant intended to "ensure harm" to the primary victim by harming all people in the primary victim's vicinity. However, when the instruction is read (1) as a whole, (2) with the other instructions governing attempted murder, and (3) with the parties' closing arguments, we conclude there was not a reasonable likelihood that the jury understood the instruction to mean it could convict appellant of attempted murder only upon a showing he intended to harm the named victims.

First, the instruction itself begins by speaking of a defendant who "intends to kill" one person also "intend[ing] to kill other persons," and it concludes by informing the jury that it must decide whether the defendant "actually intended to kill" the victims as persons in the risk zone. The overall thrust of the instruction relates to the defendant's intent to kill, not his intent to harm.

Second, the jury was instructed that, to prove defendant guilty of the four attempted murder charges, the People had to prove that defendant harbored "a specific intent to kill unlawfully another human being." The jury was also instructed to consider the instructions as a whole and each in light of all the others and not to single out any particular sentence or individual point or instruction and ignore the other instructions. These instructions reinforced the requirement that the jury had to find appellant intended to kill before it could convict him of attempted murder.

Third, the prosecutor and defense counsel both emphasized the requisite element of intent to kill. The prosecutor headlined a segment of her argument by stating the phase: "Intent to kill." She then discussed at length and in detail the evidence that demonstrated appellant intended to kill all five people grouped in front of the York Street house. She concluded this segment by stating: "Very compelling evidence I would submit to you of the intent to kill."

In response, defense counsel argued that appellant and Sandoval shot at the parked white car because they thought Robert, who had crouched behind it, had a gun. ". . . . I think the shots were directed at that car. I don't think there was an intent to kill. I think there was an intent[,] actual but unreasonable[,] to keep that man [Robert] pinned down because they thought he had a gun and [they wanted to] get out of there quickly."

Defense counsel also argued that the raid firing of the guns was expressive of appellant and Sandoval's fear, whereas "an intent to kill" would have been manifested in slower shots which would demonstrate "aiming" and "trying to accomplish" something. "If

there's an intent to kill in this case, I think this car [the burgundy Honda] would have been stopped, people would have been shot. You had this situation where a car pulled up and again it's not until the car is approached in a manner that gave an actual or unreasonable belief in the necessity of imminent peril and necessity to defend one's self. That you have this situation. That doesn't excuse it. But it brings it down from murder, which requires specific intent, a deliberate intent, premeditative if it's first degree, brings it down to manslaughter. And I think that's closer to the facts in this case."

In rebuttal to appellant's argument, the prosecutor argued that, even assuming appellant felt threatened when Robert approached the burgundy Honda, the more logical reaction of the Honda's occupants would have been to speed away, not to open the door and shoot, or, at most, to fire a single shot and drive off. Instead, the prosecutor reiterated, the assailants continued to fire multiple times after Robert had turned away from them and run to the sidewalk, and his companions had taken cover, all of which was consistent with an intent to kill all the people on the sidewalk "[b]ecause there is no other explanation why 12 rounds would be fired."

In light of the instructions as a whole and the parties' arguments, there is no reasonable likelihood that the jury was misled by the use of "harm" and "harming" in CALJIC 8.66.1 to believe it could find appellant guilty of attempted murder without finding he intended to kill.

The California Court of Appeal also rejected petitioner's claim that the length of jury deliberations and the jury's rejection of some of the special allegations and the first degree murder charge "clearly reflect an extremely close case in which any error in the jury instructions, such as that raised here regarding the intent element of the attempted murder charges, could easily have improperly tipped the balance against [petitioner] in favor of conviction." Petition, 27-28.

Appellant argues that the length of the jury's deliberations reflects "an extremely close case" in which any error in the jury instructions, such as the erroneous CALJIC 8.66.1, "could easily have improperly tipped the balance against [him] in favor of conviction."

The jury retired to deliberate on Monday, August 9. It did not deliberate on Thursday, Saturday, Sunday, or Wednesday, August 12, 14, 15, and 18.

On late afternoon Thursday, August 19, the jury notified the court as to the counts and special allegations on which it had reached unanimous verdicts and those on which it was unable to reach a unanimous verdict. On Friday morning, August 20, the court instructed it to continue deliberating. On Friday afternoon it asked the jury for all the verdicts or special allegations on which it had reached agreement. The clerk then read the verdict forms. The verdict form that had been signed Monday, August 16, found appellant guilty of count 2, attempted murder of Robert, and found true the allegation that he intentionally and personally discharged a firearm in commission of the crime.

The verdict forms that had been signed Tuesday, August 17, found appellant guilty of counts 3, 4, and 5, attempted murder of Pablo, Barbie, and Veronica, and found true the accompanying section 12022.53, subdivision (c) allegations; guilty of count 7, discharge of a firearm at an inhabited dwelling, and found true the accompanying allegation that he intentionally and personally discharged a firearm and inflicted death on Leticia; guilty of count 8, unauthorized possession of a firearm; and not guilty of count 6, discharge of a firearm from a vehicle.

> The jury did not present a verdict form as to count 1, murder of Leticia.
>
> The court then instructed the jury to return on Monday, August 23 to deliberate further. On Tuesday afternoon, August 24, the jury notified the court it was deadlocked on all remaining charges and special allegations. The prosecutor then dismissed count 1 to the extent it charged first degree murder with special circumstances as to both defendants. As to count 1 the jury was instructed to make a decision on second degree murder or lesser included charges.
>
> On Wednesday, August 25, the jury found appellant guilty of count 1 and found true the allegations that he personally discharged a firearm and inflicted great bodily harm or death on Leticia.
>
> Appellant's argument that the length of the deliberation reflects prejudice from CALJIC No. 8.66.1 is, at best, speculative. Trial in this case, i.e., from opening statements through closing arguments, lasted seven seeks (June 15-August 6). Two defendants were each charged with eight counts and 19 special allegations, including the extremely serious charge of murder with special circumstances. The charges against codefendant Sandoval, other than the charge of evading a police officer, were problematic because there had been no eyewitness identification of him by any of the York Street victims. According to the verdict forms, the jury reached its verdicts in the attempted murder counts as to appellant after four days of deliberation (count 2, Robert) and give days (counts 3, 4 & 5, Pablo, Barbie, Veronica) respectively. The deliberations were not disproportionate to a trial of this length, with its voluminous quantity of witnesses and exhibits, and the number and gravity of the offenses the jury had to decide.

Exhibit 3 at 8-12.

The state court's finding that no federal constitutional error occurred was not unreasonable. Under the circumstances described, there was no reasonable likelihood the jury misapplied the instructions to convict petitioner of attempted murder. CALJIC No. 8.66.1 itself required the jury to find intent to kill, as did the instruction on the elements of attempted murder. Also, both attorneys discussed the attempted murder counts in terms of intent to kill. Furthermore, this was not a close case. The evidence clearly established that petitioner sprayed an unarmed group of people with bullets from a semiautomatic weapon with the intent to kill Robert Martinez and the concurrent intent to kill everyone in Robert's immediate vicinity to ensure Robert's death. Robert Martinez had absolutely no doubt that petitioner was the shooter. 7RT 1699-1700.

The California Court of Appeal's conclusion that the jury was properly instructed was not an objectively unreasonable application of federal law or an unreasonable determination of the facts. Further, even if this Court were to find that constitutional error occurred, it was harmless under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)

(per curiam). For the reasons stated by the state court in its careful analysis, any error had no substantial and injurious effect on the verdict.

**CONCLUSION**

Accordingly, respondent respectfully requests that the judgment be affirmed.

Dated: May 9, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

PEGGY S. RUFFRA
Supervising Deputy Attorney General


/s/ Sharon R. Wooden
SHARON R. WOODEN
Deputy Attorney General

Attorneys for Respondent

SRW/srw/lls
SF200840116
c:\dat\Wooden\Salcedo.P.'s&A.'s.wpd

Mem. of P.'s & A.'s in Supp. of Ans. to Pet. for Hab. Corpus - *Salcedo v. Haws* - CV 07-5513 MHP

12

**TABLE OF CONTENTS**

| | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
|     The York Street Shooting | 2 |
|     The Oakdale Avenue Events | 3 |
| STANDARD OF REVIEW | 3 |
| ARGUMENT | 4 |
|     I.   SUFFICIENT EVIDENCE SUPPORTS PETITIONER'S ATTEMPTED MURDER CONVICTIONS | 4 |
|     II.  THE JURY WAS PROPERLY INSTRUCTED | 7 |
| CONCLUSION | 12 |

# TABLE OF AUTHORITIES

Page

**Cases**

*Brecht v. Abrahamson*
507 U.S. 619 (1993) .................................................................................................. 11

*Calderon v. Coleman*
525 U.S. 141 (1998) .................................................................................................. 11

*Estelle v. McGuire*
502 U.S. 62 (1991) ................................................................................................. 7, 8

*In re Winship*
397 U.S. 358 (1970) .................................................................................................... 4

*Jackson v. Virginia*
443 U.S. 307 (1979) .................................................................................................... 4

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005) ..................................................................................... 4

*Middleton v. McNeil*
541 U.S. 433 (2004) .................................................................................................... 7

*People v. Bland*
28 Cal.4th 313 (2002) ............................................................................................. 5, 8

*Williams v. Taylor*
529 U.S. 362 (2000) .................................................................................................... 4

**Statutes**

28 United States Code
  § 2254 ........................................................................................................................ 3
  § 2254(d)(1) ............................................................................................................... 4
  § 2254(d)(2) ............................................................................................................... 4

**Other Authorities**

California Jury Instructions, Criminal
  No. 8.66.1 ......................................................................................................... 7, 8, 11